Thank you, Your Honor. I'm Forrest Nelson. I represent the appellant, who is Mr. Scott, right over here. What we're asking the court to do today is reverse and send this case back to the district court in Dallas. This case concerned paratransit cab service in the Dallas area. They basically carry people who are in wheelchairs primarily or they're in walkers or things like that. Oftentimes, when you have a claimant, the claimant is oddly enough the passenger in the vehicle. In this case, Mr. Scott was retained by an insurance company. It was actually a group of insurance companies that basically worked out of Chicago, but they came down to Texas to get counsel to handle these cases. This is a niche type of insurance policy, not unlike crane policies, where you just have a small group of insurance companies that write these policies. So the insurance policy was written out of Chicago. The company that was managing it was a group called Atlas Financial. They structured it such that the insurance companies were separated out, and then they took care of all the things associated with handling of the claims through Atlas Financial. You'll find most of that in, I want to say it's 189 through 192 of the record, where they have the billing guidelines and they set forth what was done. Basically, the money would come in from the insurance companies. Atlas would be the one that would take the premiums. The premiums would be allocated according to the insurance companies, and then Atlas, for all intents, handled all the claim adjusting. They handled the advertising. They handled everything associated with the insurance company, and they handled everything associated with the adjustment of the claims. Mr. Scott was retained to handle the cases in the Dallas area. When you say retained, were there engagement letters? Were there emails? What substantiated each engagement? Well, it's like most of the time when you deal with insurance companies, the insurance company comes down. The first time they hire you, it's in person. If there's some kind of meeting where you discuss it, and then once you're retained, after that you basically abide by the billing guidelines. And what happens is when somebody presents a claim, the claim is submitted because it's through an insurance company. They send the claim back to, in this case, Atlas Financial. Atlas Financial will get the claim, and then they'll pick a council either in Houston or Dallas or San Antonio to handle the case depending upon where it is. Once they're hired, then they have to run the billing guidelines through Atlas Financial. Not just the billing guidelines, but were there documents, contracts, emails, anything to substantiate the retention? Yes. What the terms would be. Yes. Once they're retained, then a representation letter goes out to the insured, and the insured is told, this is your retained counsel. Contact your retained counsel and make sure that you abide by what you have in your insurance agreement, which means basically make sure you cooperate with the insured, with the retained counsel. So it runs that way. The letter is through a representation that goes to the insured, and that's part of the case that we have here associated with a breach of contract claim because in the retention letter that went back to each insured, it carried the same language, and the language said that Atlas Financial, we are hiring Greg Scott to handle the case, and that's the case that we were talking about regarding the breach of contract claim, was the Reagan case out of Fort Worth that said that once you send out a letter saying you are hiring somebody, you've satisfied the three elements that were an issue in the breach of contract. You've satisfied offer, you've satisfied acceptance, and you've satisfied consideration. Therefore, you have a contract. Getting back to the claim, once they're hired and retained, then there's obligations under the law in the state of Texas. The government code section 52.059 says that we had a problem in Texas with lawyers who weren't paying court reporters, and it was a bad problem. It was unfortunate for the court reporters, so the state passed a law saying you have to pay the court reporter, and they basically put the lawyers in the position of being the ones who were obligated to pay. In this case, what happened was the insurance company started having financial problems. In 2018, there were claims made that the insurance companies had inadequate reserves, and there was investigations done by the state of Missouri and the state of New Jersey, if I remember correctly, and the state of New York. After they had the problems with the investigation associated with inadequate reserves, they had four insurance companies. Two of the insurance companies were then put into rehabilitation, which means the insurance commissioner where the state where the insurance company is formed comes, and he says your insurance company is still going to operate, but somebody here at the state insurance commission is going to make sure that you operate in a certain fashion. The insurance company that was doing business with Mr. Scott was Gateway Insurance. There were four insurance companies. These two of the insurance companies were put into rehabilitation in the summer of 2019. That was not disclosed to any of the council. In the fall of 2019, October of 2019, Gateway was put into rehabilitation. Then in January of 2020, they had a stocking horse sale, and in the stocking horse sale, they get one insurance company to say I will buy this insurance company, and then for all intents, the insurance company is put up for auction, and they have a floor for all intents. This one insurance company says we'll buy them, and we'll pay this much. Well, the stocking horse sale in this case did not go through because it turned out the reserves were worse than people thought evidently. So my client was not advised of anything associated with this rehabilitation or with the stocking horse until July of 2020, and in July of 2020, the entities were put into liquidation. Once they go into liquidation, the insurance commissioner or whoever it is manages the insurance companies in the state, in this case Illinois, sent a letter to my client saying you're in liquidation. This thing is closed down, and that letter goes out to all the plaintiffs' counsel who are handling these cases, and it's filed much the same as a bankruptcy notice telling them the insurance company is going into liquidation. Now you have to deal with the liquidator up in Illinois. They knew in 2018 that they had problems with reserves. They knew in 2019 that they had been put into rehabilitation. But your client kept getting paid until somewhere in 2019, right? He kept getting paid, but he kept getting pushed off. If you look at the summary judgment evidence, they were only paying part of the bill, and then they stopped paying the expenses. So my client is on the hook for experts. He's on the hook for doctors who are treating physicians. He's on the hook for the court reporters, and that's the most important one because the court reporter is statutory. You can't walk away from that. My client does suffer injury from it because now when he tries to go to get an expert, what does the expert say? This is a small community. It's a niche business. The expert says we know you're not paying. What does the court reporter say? I'm not going to deliver you the transcript, and I'm not going to do any more work for you. Nobody denies that your client has been put in a very bad position, but the district court or magistrate judge wiped out all of your claims on various legal grounds. So could you address what your client's claims are and why those lower court decisions might be in error? My client brought basically four claims against the principals and against Atlas Financial. One of the claims was fraud, and the fraud was based on nondisclosure. He didn't tell us any of these things. If they had told him the situation, he could have gone to the plaintiff's counsel and said we do not have insurance. The insurance company is in a bad shape. We're not going to be able to go forward with the case. Then the plaintiff's counsel would have been able to make a decision as to whether they wanted to deal with the liquidator or go forward with the case. The same thing could have been done for the insured, and that's what's important because once the insured knows in 2018 there's inadequate reserves or knows in 2019 there's a rehabilitator, the insured has the ability under the policy to cancel the policy. Once the insured cancels the policy, then the insured has the ability to go out and get insurance. And in the city, pardon me? The theory you're talking about here was fraud. Yes. You're supposed to plead that specifically. What is the specific statement that you're… Well, the specific statement was nondisclosure as to the financial condition of the insurance company. What they failed to… That's not a statement. That's an omission. Yeah, it's nondisclosure. I'm sorry, Your Honor. It's nondisclosure. They didn't tell us about the financial condition. Therefore, we weren't able to make an informed choice. Neither was the insured, neither was the plaintiff's counsel, and neither was the claimant. Nobody can make an informed decision as to what they were doing. And what they failed to tell us was this. The person who failed to tell us was Atlas Financial because we're submitting reports to Atlas Financial as the case goes on. We're also, under the billing guidelines, Atlas Financial is the one who's giving us authority to hire the experts when they know they don't have the money to pay them. All of these things are flowing through Atlas Financial, who we have to go through for the billing guidelines, and we're not being told anything. And we're continuing to hire experts. We're continuing to hire court reporters. We're continuing to get ready for trial. And the client, in Dallas, there are ordinance associated with paratransit. You have to have minimum amounts of insurance because of the risk associated with carrying people who are handicapped, can't get around, they're not ambulatory. So the fraud flows from the ineffectiveness in telling us. We were giving the information to them as to what we were doing in the case, and they never told us we have problems. Never. So the fraud emanates from that. The other claim that we had was associated with negligence. And I know that two of you are from the state of Texas, and I know, Judge Ho, that you're from the state of Texas. Therefore, you're familiar with the Traver case and the notion that there's a tripartite relationship that flows between the insurance carrier, the insurance retained counsel, and the insurer. Each one of them hold duties that are tort, common law, that are separate and apart from contract. The insurance company has to deal with this in good faith under things such as stowers and settlement. We have an obligation as the attorney to make sure that we do things that don't force benefits to flow to the insurance company. The Tilley case, I'm sure the court's familiar with Tilley, in which there was an attorney who tried to shift the case so that coverage would be denied, and he did it for the benefit of the insurance company. The attorney also has a common law duty associated with malpractice. He can't commit malpractice in handling the case. And then on the insurer, the insurer has the obligation to avoid Mary Carter agreements, the Gandy case where you roll over on the insurance company for the benefit of another plaintiff, so that there were negligence benefits that flowed to my client associated with handling it. And then the last thing that we talked about, besides contract fraud negligence, the contract claim I think is fairly straightforward, Your Honor. We complied with the billing guidelines. You didn't pay us the money, and you didn't protect the insurer. And we believe that when Atlas sent out the representation letters and they were telling all of these insurers that Atlas had hired us to represent the insurers, they created a contract between us and they had to pay. And then the last point, Your Honor, which doesn't deal with the claims but is associated with the 12B2 claim in which we sued three of the principals of the company, those things on the 12B2, we were denied that because the magistrate indicated that there weren't sufficient minimum contacts. The only contact that the magistrate represented occurred was an oral meeting that happened at a breakfast when Mr. Shugaroo, who was the chief financial officer, chief operating officer, came down and met with my client in Dallas, made the decision to put him on as panel counsel. And our position is a bit more than that because in October of 2019, there was a report filed with the SEC by Atlas Financial. And in that report, Atlas Financial said that the class action suit that had been brought against Atlas Financial associated with the inadequate reserves, that they had filed a response to that class action and they thought that they were going to prevail on that and the inadequate reserves were going to be problematic. The only problem with that was that they filed that report with the SEC in November after the September quarter and when they filed it at the end of October 1st of November with the SEC, they knew at that time that two of their companies were in rehabilitation and a third company had just been put into rehabilitation. That was not disclosed in anything associated with the 10Qs. So our feeling is that the people who filed the 10Qs are the principals. They're the people who are in charge of the company. They're the ones who make the disclosures. They knew exactly what was happening. They didn't make those disclosures and therefore it just perpetuated the fraud that was committed on my client by telling him, keep representing these people. Keep doing what's necessary to make this case go. We'll pay you not to worry. And I just think we have to give some kind of benefit to people so that they can make informed decisions so that if I know my insurance company is failing, I can get another insurance company and cancel my policy. If I know the insurance company is failing, I can tell the plaintiff's lawyer and the plaintiff's lawyer can tell me, I don't want to deal with the liquidators, we'll just stop the lawsuit now. But we need to know the information that has to be disclosed so that there can be an informed decision made by everybody associated with the case. And there wasn't that done in this case and I think it needs to be sent back so that that can be developed. All right, sir, thank you. We'll hear from Mr. Smick. Judge Jones, Judge Ho, Judge Wilson, counsel, may it please the court. Ross Smick on behalf of the Appalese and Cross Appalachians. We are here today because Mr. Scott has refused to avail himself of the safeguards that were made available to him under Illinois insurance law. Mr. Scott could very well have gone to the receiver appointed by the Circuit Court of Cook County, Illinois, and said, here are my bills, please pay them. He did not. Would they have been paid? I don't know, Your Honor, because it is not in the record as to how much was left in the pool of premium. Well, normally insurance liquidators don't pay, don't have very much to pay off claims. That could very well be true, Your Honor, but no discovery was taken on that issue, and it's simply not in our record. So we do not know. But Mr. Scott should have done that. We had a bankruptcy case immediately before us. It's like a bankruptcy. Counsel, I believe, acknowledged as much. What Mr. Scott chose to do, he chose to sue the grandparent holding company incorporated in the Cayman Islands, saying, no, no, no, they are the ones with whom I had one big overarching contract for my services. I think I heard opposing counsels say that there was an engagement documentation with Atlas. Is that correct? The documentation, Your Honor, to which counsel refers to were standard letters sent out saying, we are acknowledging a claim made against our insurer Define we. Excuse me? Pronoun rule, define we. Of course. You said it. Of course. Atlas Financial acknowledges a claim on behalf of Gateway Insurance Company or whatever appropriate insurance company there was. One piece of evidence that counsel left out was that the employees writing those letters were actually employees of another granddaughter company of Atlas Financial that was called American Country Insurance Company. When I represent... Why was Atlas listed then? I beg your pardon? Why was Atlas listed? Why was that consistent? No, why was Atlas listed in the letter? Atlas was listed because Atlas was the group of insurance companies, and that's the point I was just about to make, Judge Wilson. It's when I represent an insurance company, I will say I represent Amtrust, a big company, a big holding company, as shorthand. But in reality, when I file pleadings, when I address the court, I address the court on behalf of First Nonprofit Insurance Company, Wesco Insurance Company. My colleagues who represent AIG will say, well, I represent AIG as shorthand. AIG has a special claims handling arm, and they say we acknowledge a claim on behalf of National Union Fire Insurance Company of Pittsburgh, standard insurance parlance. But at the end of the day... The question is who retained the attorney, right? I assume that's what we're talking about here. The question is who had the contract with Mr. Scott. Mr. Scott's original claim against Atlas Financial, the grandparent company, and the three corporate officers in their individual capacities, we'll get to that in a bit, was I had one big contract with Atlas Financial, the grandparent. Our contention, and we believe this is where the district court went, was that there was a retention each time Mr. Scott got a letter, and that retention was on behalf of the insurance company. It was on behalf of the actual corporate entity that had the duty to defend the insured and ultimately the duty to indemnify the insured. Atlas, it is undisputed, was never an insurance company. It is not an insurance company. Its direct subsidiary, American Insurance Acquisition, is not an insurance company. It's only when you get to the third level of the corporations, Your Honors, that one actually reaches the insurance companies. Those were the companies with whom Mr. Scott had the contract. And how do we know that? Because Mr. Scott was paid by the insurance companies. Magistrate Ramirez made that very clear in her findings and recommendations, that whatever else we want to say about what Atlas did, promulgating the counsel guidelines, etc., etc., at the end of the day, Mr. Scott had to know that he didn't have a contract with Atlas, the grandparent company, because he was always paid by the insurance companies, and he always accepted those checks. Under substantive Texas law, payment is an essential element of any contract. That has gone undisputed. That argument has not been made anywhere in Mr. Scott's briefing. The fact of the matter is he was paid by the insurance companies, he accepted those payments over a period of almost six years without complaint, and then when it got to the point where, unfortunately, the insurance companies had to be placed into receivership, into liquidation under its home state of Illinois' law, he got the letter. So, at the end of the day, the breach of contract, and it's nice to be able to address the breach of contract claim up front, because Mr. Scott pretty much flipped the entire analysis on its head. His first three complaints in this case, Your Honors, were for breach of contract, were based in contract, and then all of a sudden, on appeal, he started our – he put his tort claims all the way up front and said, well, you know, kind of buried his contract claims to the end. So, if I may, let me address those additional claims, because after his second amended complaint, and after at least the – and after Atlas had filed its answer, Mr. Scott tries to move the goalposts. He asserts all sorts – he asserts, first of all, an alter ego theory, in other words, corporate veil piercing, trying to pierce not one but two corporate veils, trying to get to the grandparent company, and then he starts filing tort claims, among them, as Your Honors mentioned, fraud. Fraud, of course, has very specific pleading requirements under Rule 9b. Magistrate Ramirez found that Mr. Scott had not met those pleading requirements. He had not met the specific pleading requirements of Rule 9b. That's nowhere to be found in today's argument. That's really glossed over at best in the briefing. Mr. Scott also throws in negligent representation. He throws in unjust enrichment and negligence claims. But now on appeal, he comes up with brand-new theories. On page 14 of his opening brief, Mr. Scott argued to this court that the first disclosure to him of Atlas Group's imminent failure was the June 11, 2020, liquidation notice. In other words, as we just heard, you should have told me that the insurance companies are going under. That allegation was never made in his pleadings. That was never argued to the district court. Fraud, fraudulent inducement, and negligent misrepresentation, those are the three causes of action, pled in his fourth amended complaint, which was ultimately dismissed, all require an affirmative representation under Texas law. In his pleadings and in his arguments to the district court, all he said was, between 2014 and 2020, Atlas and his corporate officers represented that his attorney fees would be paid. Nothing about fraudulent concealment. Nothing about, oh, you should have told me that these insurance companies for whom I'm doing work are going under. You should have told me that. There was nothing to that effect. That, Your Honors, is classic waiver of an argument on appeal. It was never pled. It was never argued before the district court. Mr. Scott says, well, that's really not a waiver. It's a forfeiture. If we look at this court's precedent under Central Southwest Texas Development LLC v. J.P. Morgan Chase, 780 F. 3rd 296, this court will excuse a forfeiture when the new issue is a pure question of law and a miscarriage of justice would result from the court's failure to consider it. In that case, this very court held that it could not excuse a forfeiture where it was far from clear whether the interest of justice would favor using a forfeiture. In that case, it was far from clear under the law because Texas didn't provide a clear answer. If Mr. Scott in this case truly believed that he had a fraud claim, he should have, and that fraud claim was based on an omission rather than an affirmative representation, what he should have done, he should have done two things. First of all, he should have done a choice of law analysis because under the record, under the affidavits that were filed before the district court, the corporate officers of Atlas were in Illinois. Nothing with respect to the SEC filings, nothing with respect to the financial condition of the granddaughter insurance companies was ever done in Texas. And that will, of course, bear on the personal jurisdiction issues. But for right now, under tort law, he should have done a choice of law analysis. He didn't do so. Secondly, he should have applied that same substantive law and said there is an established ongoing duty to make that affirmative representation. There is an ongoing duty to take the bull by the horns and say, guess what, Mr. Scott? These two insurance companies are going under. There is absolutely no such recognized duty ever. Mr. Scott can't point to it. He doesn't point to it. There is nothing in his original brief or reply brief that says that such a duty exists or can exist. And as a matter of fact, and Atlas would submit to this court, Your Honor, it can't exist because what that would do is essentially tell insurance companies, you have to breach your duty to defend to your insurance. That's what that would amount to. On pages 16 and 17 of his reply brief, Mr. Scott says, hey, you should have told me. And then he goes so far as to say, well, Your Honors, look at the putative class action that's pending in the Northern District of Illinois. What Mr. Scott doesn't tell you is that that case is disputed. No findings of fact have been made in that case. And then he says, well, the where of the misrepresentation was Dallas, Texas. No, it wasn't. Atlas is in Illinois. There is no evidence in this record that anything happened in Texas. So for those reasons, we ask that the district court's dismissal of the fraud claims be summarily affirmed. Mr. Scott's unjust enrichment and negligence claims, I'll handle them together because they are defeated by the same fact. The fact is that it was never disputed that Mr. Scott performed his legal services. He performed them, and by all accounts, he performed them well. Mr. Scott, by all, everything I've heard, is an excellent tort lawyer. He's very good at defending auto accidents. Unfortunately, that means that when he, unfortunately, that means he had agreements with the insurance companies to represent their insureds. That means that unjust enrichment fails as a matter of Texas law, and that means that negligence fails as a matter of Texas law. Where there is an express contract, and in this case, it was with the granddaughter companies, the actual insurance companies, unjust enrichment and negligence cannot stand. Allow me to turn to the personal jurisdiction issue over the corporate officers. First of all, I have to point out that there is a dispute as to the standard of review on that issue. We have pointed out in our briefing that the only objections that Mr. Scott filed to Magistrate Ramirez's findings, conclusions, and recommendations was on the summary judgment motions that addressed the contract claims, essentially. Mr. Scott did not object to Magistrate Ramirez's findings and recommendations on the 12B6 dismissal of the tort claims or the 12B2 dismissal of the corporate officers for want of personal jurisdiction. So we have submitted to this Court that the proper standard of review there is plain error. On page 25 of his reply brief, Mr. Scott claims to have properly objected before the District Court to Magistrate Ramirez's findings and conclusions regarding the corporate officers' Rule 12B2 motion. He claims to have made his objections together with his objections to Her Honor's findings and recommendations on the motions for summary judgment that addressed the breach of contract issues. That argument is very easily contradicted under procedural law. 28 U.S.C. 636 and Rule 72B require objections to a magistrate's findings be made within 14 days. Magistrate Ramirez recommended that the 12B2 motion be granted on June 9, 2021. Chief Judge Lynn accepted those recommendations on July 6, and the document where Mr. Scott supposedly objects to those findings was filed not until September 10, 2021. So Magistrate Ramirez's findings were quite old by that time. Chief Judge Lynn had already ruled on them, but now Mr. Scott says, but no, no, no, I preserved that issue for appeal. I still get a de novo review on that. No, Your Honors, I'm sorry, he doesn't. He gets a plain error review. He then doubles down on page 25 of his reply brief. He says that the corporate officers argued that they were not subject to personal jurisdiction in Texas because they were not culpable. He tries to dirty up the corporate officers. He says, oh, my gosh, there's this Northern District of Illinois class action pending against him. That's not the rule. We all know from first-year civil procedure, that's not the rule. There was no dispute in Penoyer v. Neff that the client didn't pay his lawyer, ironically enough. The question was, could the lawyer sue in the lawyer's home jurisdiction, or did the lawyer have to go to the client's home jurisdiction? The Supreme Court held, and we all learned on the first day of law school, no, you've got to go where the defendant lives. In this case, Your Honors, the affidavits of the corporate officers were uncontradicted. They had very few contacts with Texas, if any. The only thing that Defendant Chagrou did was meet with Mr. Scott over breakfast one morning in 2014 saying, hey, yeah, we may want to get you on our insurance company's panel. But that's not personal jurisdiction worthy. As this Court said in Revel v. Lidoff, engaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within a state borders. In other words, doing business with Texas is not doing business in Texas. No reasonable argument that the dismissal of the corporate officers for lack of personal jurisdiction was claim error in this case, Your Honors. And then as far as the officers filing the Q10 statements and that that was aimed toward Texas, a 10Q statement, or yes, a 10Q statement, it's an SEC form. It is a form filed under federal law. It goes out to the public so that they can make appropriate decisions regarding investments. There is nothing suggesting that that communication was specifically directed toward Texas. And even if it was, the case law on personal jurisdiction says even if you direct a communication from State A to State B doesn't make one amenable to personal jurisdiction in the other state. Since I have one minute left, I would like to very quickly address our cross-appeal. Magistrate Ramirez got everything right in this case. And I understand the district court's hesitance to sanction a member of the local bar. But under this court's snapshot rule, as set forth in our briefing, rule 11 starts to apply the moment a lawyer puts his or her signature to a document. Mr. Scott began this case by suing corporate officers in their individual capacities for breach of contract despite black letter law that says a corporate officer is not liable for the corporation's debts. The people who run a corporation are distinct from the corporation itself. By suing the corporate officers, forcing them to suffer the indignity of being served at their homes, Mr. Scott had no legal basis to do that. We have taken a tempered approach to our rule 11 motion. We respectfully submit the district court abused its discretion in that small piece of this case. But we do request that the rest of the district court rulings be affirmed. If the court has no questions, thank you. I'm afraid we have no questions. You're very thorough. Thank you. Mr. Nelson, rebuttal. I would like to spend most of my time trying to give you citations to the record to assist you. Judge Wilson, you ask about the representation letter. It's in the record at 309. I think there were some questions associated right there at the end associated with minimum context. The courts have taken a different view with minimum context when it deals with an insurance company. I would cite McGee versus International Life Insurance 355 U.S. 220-1957, U.S. Supreme Court opinion in which one insurance policy was sold by a Texas company to one person in California. And because it was dealing with insurance and a highly regulated business, the court said that was sufficient. The other point to the- Was it sufficient with respect to an insurance company or with respect to officers? With respect to the insurance company, not with respect to the officers. But the one point I wanted to make with that, Judge Ho, was it's an issue as to who was the person directing the activities. Because in the cases that are cited about the inability to come to Texas because they did business in Texas, in all those cases, somebody from Texas had started the negotiations with somebody in a different state. This was a case where they brought the contact to us. We did not go to Illinois. They came to us. The defendants directed their activities to the state of Texas. Then the other points I would put out as to the categories, the guidelines are on page 189, 192. The documents- I'm sorry to take your time, but your citation in terms of the engagement is record 309? 309. Representation letter. This is a letter to somebody else, right? It's not between- It's to the insured telling the insured that we, Atlas Financial, have retained- It's a representation to a third party. It's not documentation between the lawyer and- They send it to us as well because we're told that we're going to be retained as counsel for that insured. But it's a letter they send to the insured saying that Mr. Scott has been retained to represent you, and they use the phrase we. And if you look at that letter, you'll see Atlas Financial appears there in bold letters throughout saying Atlas Financial will do this, Atlas Financial will do this, Atlas Financial will do this, all within the representation letter. There's no mention as to Gateway, other than on, I think, on the basis to who the insurance carrier was. Then if we take a look at the other documentation- You agree this is not a representation letter. This is a letter to the insured. Well, you have to tell the insured who's going to be representing you. So the insured knows who to contact. The insured knows who to make contact with regarding the case, who to give the records to, who to give the photographs to, who to give the police report. In terms of the engagement. And again, Judge Wilson, the difficulty is in dealing with insurance companies, they often don't have engagement letters. They hire you the first time. Well, at my firm, we did. You know, I mean, I get that a lot of lawyers travel without a written engagement letter or maybe an email back and forth and maybe a handshake, and those things are laudable in a bygone era, I guess. But an engagement letter, they teach you early on in lawyering, setting out the terms and the billable rate and the we'll do this and we'll pay for that, and here's the travel we're going to pay for and here's the experts we're not, and here's what you go through to get approval and all that. I mean, and I get billing guidelines. I've lived under them too. But the engagement letter is not the letter that goes out to an insured that says, here's who's your lawyer. Your Honor, I've been representing Nationwide and Scottsdale for probably 30 years. I've been representing farmers for probably 32 years. Nothing. I hope they don't go into liquidation. Pardon me? I say I hope they don't go into insolvency proceedings. So do I, Your Honor. But we sign one agreement the first time and then after that, every three years, we get new billing guidelines, and if something peculiar happens during that time frame, we get a document from them. For example, probably three weeks ago, farmers said, from now on, we want you to use this type of system to do the billing. In this case, for example, they use LegalX, but the billing guideline, the billing platform, was through Atlas Financial. It wasn't through Gateway. It wasn't through anybody like that. It was all set up through LegalX, which Nationwide uses and Farmers uses now. And it's a billing platform that's all electronic and it goes through them and it pays through them. So that the last... When you work for farmers, are you really working for a different insurance company? It depends. Sometimes for farmers I work for Foremost. Sometimes I work for farmers. Sometimes I work for Farmers Insurance Exchange. If it's an intellectual property case, I go through Foremost. If it's a standard trucking case or something like that, I go through Farmers. And then the other farmers entity, I wish I could remember the type of case they had, but I've dealt with three. And in Nationwide, they used to have Scottsdale Nationwide, Nationwide Farming, and I did a few farming cases. And there would be different guidelines that would come from each one of them. As a matter of fact, I wish I was still doing the farming work, Your Honor, because they were the easiest ones to deal with. But if I could give you just a few more numbers on the examples, 191 and 192 are the ones that talk about required approval from ATLAS if you want to get an expert task. They also said if lawyers do tasks that they think are paralegal work, they'll compensate you at paralegal rates. That was done by ATLAS at 192. And then Scott continued to incur expenses. That's at the record at 2825 through 2848, where he sets forth all the money he's been paid versus what is still owed and the fact that he's still getting approvals to do the work. When did he send that recap out? That recap was, I don't know when he sent it out, Your Honor, but I do know that that was included within his response to one of the summary judgments with a motion to dismiss. What's the record site on that one? R2825 through 2848. And then there was a few more numbers, Your Honor, I'm trying to find, where he gave statements to the court associated with that. 4564, the record at 4564. And that dealt with representations to Scott associated with reimbursement for court reporters, mediators, and experts. And I forgot to include mediators as somebody who would be on the billing platform, and as judges you probably know there's a fair number of judges that do mediations. Although the judges have the ability often if you don't pay them in time, they'll cancel within 24 hours. But that said, the judges also are in a position, and I'm sorry about the time, but the judges are also in a position where they require you to have mediations before you can go to trial. That's not uncommon in Dallas County. So that you're basically putting Mr. Scott in an untenable position when you knew he was in an untenable position. It was unfair to him, the insureds, and also to the plaintiff's lawyers. Thank you. Okay. Thank you very much. We are in recess until 2.30 this afternoon.